**Billy James THOMAS, Jr., a/k/a Billy James Thomas, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–00–050–CR.**

Court of Appeals of Texas, Fort Worth.

May 17, 2001.

Suzanne Hudson, Arlington, for Appellant.

Tim Curry, Dist. Atty., Charles M. Mallin, Chief Appellate Asst. Dist. Atty., Steve Conder and Michelle Hartmann, Asst. Crim. Dist. Attys., Fort Worth, for Appellee.

Panel A: CAYCE, C.J.; DAY and DAUPHINOT, JJ.

**OPINION ON REHEARING**

DAY, Justice.

Upon the court's own motion we have reconsidered our prior opinion. We withdraw our opinion and judgment of February 8, 2001, and substitute the following.

Appellant Billy James Thomas, Jr. pleaded guilty to the offense of aggravated assault causing serious bodily injury. After finding that Appellant used a deadly weapon and because of a prior felony, the jury assessed an enhanced punishment of seventy-five years' confinement. In a single point on appeal, Appellant contends the trial court erred in including an instruction regarding parole and good conduct credit in the jury charge when Appellant was not eligible to receive good conduct credit for his offense. We affirm.

**I. BACKGROUND**

Appellant and Katy Neely dated for over a year. After Katy ended their relationship, Appellant was upset and threatened to kill himself. After the breakup, Appellant continued to pursue Katy. On one occasion, Appellant was sitting in Katy's car when she got off of work at Blockbuster Video. Appellant and Katy

talked about their relationship, and Katy drove Appellant home. Appellant then asked Katy if she would come by and see him after she got off work the next day. Katy agreed.

The following day, Appellant called Katy's house to make sure Katy was still going to come by and see him after work. However, Appellant went to Katy's place of employment and was waiting for Katy when she got off work that afternoon. Appellant told Katy that he had rented a motel room and said that there were some things he wanted to show her. Katy drove Appellant to the motel and went with him to the room. Once in the room, Appellant showed Katy a photo album with pictures of the two of them and a note Katy had written him during the relationship. He asked Katy if those things meant anything to her. Katy said that they did "at one time, but they mean something different now."

Katy said that she had to go home, at which point, Appellant grabbed a razor blade and slit Katy's throat from behind. Katy fell to the floor. Appellant got on top of Katy, covering her mouth and holding her arm to the ground, and asked if Katy would lie on the bed with him. Katy nodded, and Appellant let her up. Appellant then slit his own wrists and threw the razor blade to the ground. Katy grabbed the razor blade and left the room. At the same time, Jeffrey Swanson was walking toward his truck from his room when he noticed Katy walking toward him with blood under her chin. Swanson and Katy went to his room where he called 9–1–1. While Katy was waiting for Swanson to call 9–1–1, she observed Appellant get into her car and drive off. Appellant was later apprehended slumped over the steering wheel of Katy's car.

## II. JURY CHARGE ERROR

In his sole point on appeal, Appellant complains that the trial court's charge to the jury concerning the possibility of parole and good conduct time contained an incorrect statement of the law in violation of article 36.14 of the code of criminal procedure. *See* TEX.CODE CRIM.PROC.ANN. art. 36.14 (Vernon Supp.2001). The trial court's charge to the jury included the following instruction:

Under the law applicable in this case, the Defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the Defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the Defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. If the Defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this Defendant if he is sentenced to a term of imprisonment, because the application of these laws will

depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular Defendant. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

This court has already rejected Appellant's argument. *See Cagle v. State,* 23 S.W.3d 590, 593–94 (Tex.App.—Fort Worth 2000, pet. filed) (op. on reh'g). Here, the trial court included in its charge the mandatory language of article 37.07, section 4(a) of the Texas Code of Criminal Procedure, informing the jury of the existence and mechanics of parole law and good conduct time. *See* Tex.Code Crim. Proc.Ann. art. 37.07, § 4(a). Although the instruction tracked the statutory language of article 37.07, Appellant argues that the instruction was incorrect and misleading to the jury because he was ineligible to earn good conduct time toward mandatory supervision release due to the jury's affirmative finding that he used or exhibited a deadly weapon. In *Cagle,* we determined that inclusion of the mandatory charge under these same or similar circumstances was not error. *See Cagle,* 23 S.W.3d at 593–94. We overrule Appellant's point on appeal.

### III. CONCLUSION

Having overruled Appellant's point on appeal, we affirm the trial court's judgment.